IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:05cr300-MHT |
| | ) | |
| LEENANDORA WOODS | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Pending before the court is the defendant's ["Woods"] motion to suppress evidence obtained during the course of a traffic stop that led to his arrest and, ultimately, indictment in this case (Doc. # 1).  The government responded, and the court conducted a hearing on 20 and 26 June 2006, at which the parties elicited testimony from several witnesses and submitted documentary evidence, including a video recording of the traffic stop (Doc. # 33). Having carefully reviewed the parties' arguments, the evidence and the relevant law, the Magistrate Judge recommends that the motion be granted.

## I.    INTRODUCTION

Woods challenges the actions of law enforcement on several grounds.  He challenges the lawfulness of the stop as well as the allegedly over-intrusive pat-down search that followed shortly after he was confronted by the patrol officer conducting the stop.  He also challenges the duration of the stop and contends that the government exceeded the scope of his admitted consent to search his vehicle.

The court's analysis begins and ends with the lawfulness of the stop, and the

discussion of the facts is limited to those relevant to the particular issues raised.


## II.    DISCUSSION

### A.    *The Lawfulness of the Traffic Stop*

Woods's briefs (initial and supplemental) in support of his motion raise two distinct challenges to the lawfulness of the traffic stop at issue, which occurred on 1 November 2005. First, Woods contends that the patrol officer who stopped his vehicle did not have the requisite level of suspicion to detain him for an alleged violation of Alabama's law establishing light reduction limits on window tinting.

The government has all but conceded that the stated reason for the stop was a ruse, a pretext for stopping Woods, who was suspected by Montgomery police officers of transporting narcotics. Notwithstanding the success of the sting, which resulted in recovering large amounts of cocaine base (crack), cocaine powder, and marijuana from a hidden compartment in the luxury sport sedan that Woods was driving, Woods nonetheless contends that police suspicions were not reasonable and could not, therefore, justify an investigative stop.


### 1.    General Governing Legal Principles

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV.  A traffic stop is considered a seizure under

the Fourth Amendment, but "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 809 (1996); *see also* **United States v. Pruitt**, 174 F.3d 1215, 1217 n.1 (11th Cir. 1999).

Furthermore,

> "[L]aw enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity. The 'reasonable suspicion' must be more than an 'inchoate and unparticularized suspicion or hunch.'" **United States v. Powell**, 222 F.3d 913, 917 (11th Cir. 2000) (citing **Terry v. Ohio**, 392 U.S. 1 (1968)). Reasonable suspicion is determined from the totality of circumstances and collective knowledge of the officers. **United States v. Acosta**, 363 F.3d 1141, 1145 (11th Cir. 2004). "[W]hether reasonable suspicion existed at the time [of the investigatory stop] is a question of law to be determined ultimately by judges, not policemen . . . . [T]he question . . . is not whether a specific arresting officer . . . actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search." **Hicks v. Moore**, 422 F.3d 1246, 1252 (11th Cir. 2005) (citing **Evans v. Stephens**, 407 F.3d 1272, 1280 n.9 (11th Cir. 2005) (en banc)).

*United States v. Nunez*, _____ F.3d _____, 2006 WL 1888957, at *2 (11th Cir. July 11, 2006).[1]

---

[1]Although distinguishable from the instant case, **Nunez**, in which the Court of Appeals reversed the district court's decision to grant the defendant's motion to suppress evidence, provides interesting insight into the court's analysis of reasonable suspicion, the relevance of which will become clear *infra*.

Reasonable suspicion existed in **Nunez** because the police had

3

2.    **Tint Violation**

      *a.    Relevant Facts*

In the course of investigating a suspected drug trafficking enterprise, Michael Drummond ["Drummond"], a sergeant with the narcotics bureau of the Montgomery Police Department's Special Operation's Division, contacted fellow police officer Carnel Mills ["Mills"] and sought his assistance in stopping a black Cadillac with dark tinted windows (Hearing Transcript, Volume I ["Tr. I"] at 12).   Mills was aware of Drummond's duty assignment, i.e., narcotics, and assumed that the purpose of the stop was related to a drug investigation (Tr. I at 63-64).  In fact, Drummond told Mills that "we wanted to get the black Cadillac stopped,. . . that they're possibly carrying drugs and we wanted to get him stopped and get a consent" (Tr. I at 13).

---

> probable cause to believe the Residence [sic] was a marijuana grow house and that, therefore, a state judge had signed a search warrant for the Residence. [The arresting officer] observed that all Defendants spent at least half an hour in the Residence, which [another police officer] had told [the arresting officer] smelled like green growing cannabis a few days earlier.  In addition, Defendants were not just present at a suspected grow house. [The arresting officer] observed [a defendant] carry[ing] a black trash bag–capable of concealing marijuana–from the Residence to the truck and [another defendant] carry a box–also capable of concealing marijuana–from the Residence to the Mercedes.  That these containers were removed from a residence for which [sic] a law enforcement officer had probable cause to believe was a marijuana grow house–while the residence was under surveillance and shortly before it was to be searched–supports a reasonable suspicion that [the defendants] were involved and were moving marijuana or related contraband from the Residence.

*Id.*  Notably, the district court's ruling was based on its finding that reasonable suspicion did not exist under the circumstances.

Prior to the traffic stop, in the course of the conversation that transpired between Drummond and Mills, Drummond, who followed the suspect vehicle after it left a residence that had been under police surveillance, suggested to Mills that the darkness of the car's tinted windows would furnish a legitimate basis for conducting a stop. "[I]t appeared that [the car's] tint was illegal," Drummond testified (Tr. I at 27). He further clarified, "When the Cadillac came by me, I couldn't see through the tint" (Tr. I at 32).

When Mills and Drummond first spoke by radio that day, Mills was not in any relevant way involved in the drug investigation. Mills was elsewhere, patrolling in his police cruiser (Tr. I at 38). When he responded to Drummond's request, Mills encountered the Cadillac driven by Woods, and, upon observing the car's tint, determined that it was too dark (Tr. I at 43). He then maneuvered to get behind the car and initiated a traffic stop, though he lacked the mechanical means to determine whether the tint on Woods's car windows was in fact illegal (Tr. I at 40; 47).

> *b.*      *The Law Regulating Vehicular Window Tint*

Alabama's regulation of the darkness or reflectiveness of vehicular window tint is somewhat dispersed within the state code. One provision states that

> No person shall operate a motor vehicle which has a windshield, sidewing or rear window which has tinting to the extent or manufactured in such a way that occupants of the vehicle cannot be easily identified or recognized through the sidewing or rear windows from outside the motor vehicle.

Ala. Code § 32-5-215(d) (1999 Repl. Vol.). However, the validity of that section is

5

questionable.  An opinion of the Alabama attorney general in 1983 described the statute as

"unenforceable," and the Alabama Court of Criminal Appeals later held it to be

unconstitutionally vague.  *Timmons v. City of Montgomery*, 641 So.2d 1263 (Ala. Crim.

App. 1993) (discussing 192 Op. Ala. Att'y Gen. 85 (Informal opinion 83-00442, Aug. 17,

1983)).  The *Timmons* court reasoned that

> [t]he statute does not alert the public as to exactly what conduct
> it seeks to prohibit.  The window tinting statute does not
> establish any minimal enforcement guidelines for law
> enforcement officials in their enforcement of this statute.

*Id.* at 1265.

In 1996, presumably in a somewhat delayed response to *Timmons*, the Alabama

Legislature enacted a statute that included the requisite enforcement guidelines but did not

repeal section 32-5-215(d).  § 32-5C-1 *et seq*.  Among those guidelines was the requirement

that the window tint's darkness or reflectiveness be "measured with a device or instrument

capable of measuring light transmission before a person may be charged with a violation of

this section."  § 32-5C-2.  Moreover, and more importantly, "*the officer shall be equipped

with such a meter <u>before</u> stopping the driver*."  *Id.* (emphasis added).

Arguably, the latter limitation conflicts with the broad grant of authority conferred

upon police officers by section 32-5-310 "to enforce the provisions of this chapter [including

section 32-5-215(d)] and to make arrests for any violation or violations thereof . . .."  § 32-5-

310.  Nevertheless, the court must "harmonize" arguably conflicting statutes to the extent

possible.  **Ex Parte *D.W.***, 835 So.2d 186, 190 (Ala. 2002) (resolving a conflict between a

general statute conferring upon adoptive parents the rights of biological parents and a more specific one establishing visitation rights for grandparents of children adopted by other family members and thereby limiting the rights of adoptive parents).

Therefore, the court may not ignore the requirement that an officer initiating a traffic stop for a violation of the tint law first possess the appropriate measuring equipment and must conclude that by adopting section 32-5C-2 the legislature intended to define the scope of section 32-5-215(d) and limit the scope of section 32-5-310.  *See*, *e.g.*, ***Medberry v. Crosby***, 351 F.3d 1049, 1060 (11th Cir. 2003) (relying on "the canon of statutory construction that the more specific takes precedence over the more general"); ***Karrh v. Bd. of Control of the Employees' Retirement Sys.***, 679 So.2d 669, 671 (Ala. 1996) ("Where general and specific provisions of a statute conflict, the specific provisions govern over the general ones.").  Consequently, Mills was not authorized to stop Woods for a violation of the tint law.

### c.     The Significance of Mills's Error

Although Mills's failure to comply with section 32-5C-2 is relevant to the question of whether his actions were reasonable, "[t]he violation of a state statute does not automatically give rise to a violation of rights secured by the Constitution."  ***Crocker v. Hakes***, 616 F.2d 237, 239 n.2 (5th Cir. May 2, 1980) (addressing an alleged violation of due

process).[2]  Notwithstanding this axiom, with which the court takes no issue, the Eleventh Circuit Court of Appeals has crystallized its position that while a police "officer's reasonable *mistake of fact* may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop, . . . [an officer's] *mistake of law* cannot." **United States v. Chanthasouxat**, 342 F.3d 1271, 1276 (11th Cir. 2003) (emphasis added).

According to the Court of Appeals, whether the mistake of law was reasonable under the circumstances is irrelevant because the expectation that law enforcement officers understand the laws they swear to uphold renders their mistake of law irremediably unreasonable. *Id.* at 1279.  Thus, "a mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop." *Id.*

There are apparently no exceptions to the rule adopted by the Court of Appeals in **Chanthasouxat,** and the circumstances of this case do not justify an attempt to craft one. Nevertheless, a key distinction between **Chanthasouxat** and the instant case merits further discussion.

In **Chanthasouxat**, the officer mistakenly believed that the defendant's actions were illegal when they were not.  *See generally id.*  In the instant case, Woods's tint was in fact illegal, as later determined by the required testing  (Tr. I at 68-70).  Thus, Mills' suspicion that Woods was violating the tint law   - absent the stop for that reason -   was reasonable.

---

[2]**Bonner v. City of Prichard**, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on 30 September 1981)**.**

*See* ***United States v. Weaver***, 145 Fed. Appx. 639 (11th Cir. 2005).[3]

In accordance with ***Weaver***, at the time of the stop, Mills undoubtedly had probable cause to suspect that Woods was violating Alabama's tint law. Thus Mills's mistake did not arise from the actual legality of Woods's conduct, as in ***Chanthasouxat***, but arose instead from Mills's lack of authority to enforce the law that Woods was violating. By analogy, then, his mistake was "jurisdictional", though not geographically so.

Notwithstanding the apparent breadth and rigidity of the rule established in ***Chanthasouxat***, the Court of Appeals has not yet determined whether the rule would actually apply in these circumstances. Moreover, other circuits appear split and, to some extent, internally inconsistent. *See, e.g.,* ***United States v. Simon***, 368 F. Supp. 2d 73, 78 (D.D.C.

---

[3]In ***Weaver***, the Court of Appeals determined that an officer had probable cause to believe that the defendant was violating Florida's tint law based on the officer's observation that "his headlights reflected" on the windows and he "could not see the driver's silhouette nor the dashboard lights through the tinted windows although he was only five feet away." *Id.* at 640.

Florida's tint law is similar to Alabama's inasmuch as it establishes specific light transmittance parameters compliance with which can only be measured accurately by a mechanical device. Seizing upon this requirement, the defendant in ***Weaver*** argued that "the statute's provision of a threshold that separates permissible from prohibited window tinting means an officer cannot have probable cause to stop a vehicle under the statute without knowing the vehicle's exact percentage of light transmittance." *Id.* at 641.

The court disagreed, noting that "probable cause requires less support than that necessary for a conviction." *Id.* (citing ***United States v. Dunn***, 345 F.3d 1285, 1290 (11th Cir. 2003). In the instant case, Mills testified that police generally suspect a tint violation "when you can't see inside the vehicle, see the occupants inside the vehicle." (Tr. I at 46). Mills and Drummond both testified that they believed the tint on Woods's car was too dark (Tr. I at 32, 43). Moreover, Drummond testified that he was unable to see inside Woods's vehicle through the tint (Tr. I at 32).

***Weaver*** is notable as well for the court's acknowledging that "[t]he statute in no way indicates that a police officer may not investigate further when he reasonably believes the statute is being violated." *Id.* Obviously, the Alabama statute differs on this important point. § 32-5C-2.

9

2005) (concluding that an officer making an arrest outside his geographic jurisdiction violated the Fourth Amendment, a conclusion that the court found "consistent with the well-recognized rule that it is not reasonable for an officer to rely upon a mistaken understanding of the law"); *contrast* **United States v. Mikulski**, 317 F.3d 1228 (10th Cir. 2003) (concluding that extra-jurisdictional actions did not "amount[] to a federal violation") *with* **Ross v. Neff**, 905 F.2d 1349, 1354 (10th Cir. 1990) (concluding that "[a] warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause"); *contrast also* **Dunn v. City of Elgin, Ill.**, 347 F.3d 641 (7th Cir. 2003) (answering in the negative the question "whether it was reasonable for the police officers to believe they had the authority to enforce" an order from an out-of-state court ) *with* **Pasiewicz v. Lake County Forest Pres. Dist.**, 270 F.3d 520 (7th Cir. 2001) (concluding that officer's extra-jurisdictional actions were reasonable under the Fourth Amendment); *see also* **Abbott v. City of Crocker, Mo.**, 30 F.3d 994, 998 (8th Cir. 1994).[4]

---

[4]**Abbott** is particularly illuminating. In that case, the Eighth Circuit Court of Appeals concluded that "the district court erred in determining, as a matter of law, that the arrest in violation of state law necessarily also constituted a violation of the Fourth Amendment" before noting, in a footnote, "the existence of some inconsistency in the rulings of this Circuit on this issue." *Id.* at 998 n.3. Two of the three cases cited by the **Abbott** court to illustrate its point concluded that the officers' actions violated the Fourth Amendment. *Id.* (citing **Cole v. Neb. State Bd. of Parole**, 997 F.2d 442, 444 (8th Cir. 1993) ("An arrest by a state actor that is not authorized by state law is actionable under § 1983 as a seizure contrary to the Fourth Amendment."); **Bissonette v. Haig**, 800 F.2d 812, 816 (8th Cir. 1986) ("An analogous rule applies, of course, to federal officers. A network of statutes authorizes them to make arrests in various circumstances and for various types of offenses . . .. Arrests outside the authority granted by these statutes are unlawful and invalid . . . and anything seized incidentally to the arrest must be suppressed as evidence, absent some exception to the exclusionary rule.")).

The third case cited to **Cole** but concluded that the officers' actions did not violate state law.

These cases, excepting **Simon**, present an unworkable application of the Fourth Amendment's reasonableness standard by attempting to distinguish between reasonable and unreasonable mistakes of law. This would certainly explain the apparent inconsistency that the Eighth Circuit has forthrightly recognized. *See **Abbott***, 30 F.3d at 998 n.3; *supra* note 4.

The Seventh, Eighth, and Tenth circuits implicitly draw a puzzling distinction between a mistake of law regarding the legality of the actions of a private individual, whom the Fourth Amendment protects, versus a mistake of law regarding the legality of the actions of law enforcement, from whom the Fourth Amendment protects the private individual, and assign no constitutional consequences to the latter depending upon the particular circumstances.

Following the unclear path established by these courts could create a class of acceptable (i.e. reasonable under the Fourth Amendment) mistakes of law, definable perhaps only by reference to individualized perceptions of elusive distinctions between particularized and ever-changing circumstances. Conversely, applying the rule set forth by the Court of Appeals in **Chanthasouxat** when the mistake of law concerns a police officer's authority to conduct a traffic stop is far less likely to result in an evolutionary rape of the Fourth Amendment's reasonableness standard. Although courts often make legal determinations based on factual circumstances that are not likely to be replicated, in light of **Chanthasouxat**,

---

**Brock v. Logan County Sheriff's Dep't of Ark.**, 3 F.3d 1215 (8th Cir. 1993). Thus, the **Abbott** court appears itself to have created the noted inconsistency.

the propriety of doing so *in this case* is still highly questionable.[5]

The Constitution and the specific principles the Fourth Amendment embraces are better protected in the long run by the application of a readily articulable and broadly applicable standard that places the burden on law enforcement to act within the parameters established by the legislature, be it federal or state. Thus, in accordance with *Chanthasouxat*, when a police officer makes a mistake regarding the law, whether the mistake concerns the legality of the actions of the suspect or the legality of the seizure itself, as in this case, the result should be - and logically is - the same: The Fourth Amendment is violated. *See Simon*, 368 F. Supp. 2d at 78.

Recognizing the possibility, however remote, that the Court of Appeals may elect not to apply *Chanthasouxat* to this case, the court also determines that, with respect to the alleged tint law violation, Mills's actions under the circumstances were unreasonable.

It would be easy as a matter of conscience to assign no harm to Mills's mistake in this case, inasmuch as Woods was breaking the law and was found to have in his possession large quantities of controlled substances. But the court's holding would necessarily have broader implications. A mother of three, traveling along the interstate with her husband and children, should have an unquestionably legitimate expectation that the police officer stopping her to issue a traffic citation and nothing more is not specifically precluded by law from doing so.

---

[5]Police officers make traffic stops millions of times each month. Because they are often followed by searches, many eventuate into constitutional challenges. In the absence of established, and therefore predictable, rules which govern police conduct and judicial consideration, resolution of those challenges could be akin to making capricious selections from an endless menu of analytical delicacies.

An officer who conducts the stop despite an explicit statutory prohibition exceeds the bounds of reasonableness and consequently violates the Fourth Amendment.  *See Pasiewicz*, 270 F.3d at 527 (noting that the court's conclusion may have differed if the law "specifically prohibited the . . . officers" from conducting the arrest at issue); *see also Alexander v. United States*, 390 F.2d 101, 108 (5th Cir. 1968) (determining that an arrest carried out by postal workers was invalid under federal and state law and thus violated the defendant's constitutional rights, adding "any arguable distinction between 'arrest' and 'detention' is not vital to this decision").  In other words, implicit in the Fourth Amendment's requirement that a seizure be reasonable is the requirement that there be no statutory prohibition of the seizure.

Thus, regardless of whether the rule espoused by the Court of Appeals in *Chanthasouxat* controls in this case or whether the court must determine whether the stop was reasonable under the circumstances, the outcome is the same.  The stop was specifically prohibited by state law.  Mills knew or should have known this and conducted the stop anyway.   As a Montgomery patrol officer, he has undoubtedly observed scores of tinted automobile windows, some of which were within acceptable limits and some of which were not.  Not surprisingly, Mills said at the scene: "Hell, I don't know what the law is," and admitted at the hearing that, when he stopped Woods, he had no way of knowing whether Woods had violated the tint law  (Tr. I, p. 58).  Moreover, Mills certainly knew that a citation for violating the tint law could be written only after a "tint test" was administered, resulting in an empirical finding that the tint was too dark.  When he stopped Woods, Mills was incapable of conducting the test, since he called another officer, Corley, to the scene to do

13

the test (Tr. I, p. 58).

In the context of the alleged tint violation, Mills's actions were unreasonable, and the alleged tint violation cannot be relied upon to justify the stop.[6]

### 2. Reasonable Suspicion that Woods was Transporting Controlled Substances

Woods contends, apparently in the alternative, that the information known to Drummond and his colleagues investigating a suspected drug trafficking operation was insufficient to develop a reasonable suspicion that Woods himself was transporting controlled substances when officer Mills stopped him. According to the government's brief, a reasonable suspicion existed because

> Detective Robert Stillman ["Stillman"][7] of the Montgomery Police Department (MPD) and Special Agent Neil Thompson ["Thompson"] of the Drug Enforcement Agency (DEA) informed Scott Edwards [of] the High Intensity Drug Task Force

---

[6]Contrast the "tint law", the enforcement of which requires the ability to gauge the violation with precision at the time of the stop, with the laws prohibiting driving under the influence of alcohol. *Contrast* § 32-5C-2 *with* § 32-5A-191. While enforcement of the latter is often attended by empirical tests, an officer need not possess a Breathalyzer to stop a driver who appears to be intoxicated. Nor are the results of a Breathalyzer test prerequisite to charging or citing a defendant for driving under the influence of alcohol, since the law permits the other evidence, such as slurred speech, the smell of alcohol, erratic movement, and the presence of alcohol, as proof of the offense. *See, e.g.*, **Meininger v. State**, 704 So.2d 1034, 1039 (Ala. 1997) (concluding that a police officer had probable cause to arrest the defendant based on the officer's observations of the defendant's physical condition and his performance of a non-mechanical field sobriety test).

[7]The government references "Stillman" and "Steelman," and the court is uncertain as to the correct spelling of the detective's name. Because the government's first use of his name is spelled "Stillman," the court continues to use this spelling.

(HIDTA) and MPD that they had received information from a confidential source (CS) ["Grice"] that Preston Grice ["Grice"], who drove a black truck, was storing and distributing a large quantity of cocaine from an address on Holcombe Street, later identified as 589 Holcombe Street. The CS also stated that a person known as Corey (later identified as Corey Harvey), who drove a yellow Caprice was also distributing cocaine from that residence. The CS further stated that "Bunky" later identified [sic] as Leeandora [sic] Woods (Woods) was at the residence, drove a black Cadillac and was involved in the distribution of cocaine from the residence.

Armed with the information, and after running a search through law enforcement databases and determining that Grice had prior convictions for trafficking in narcotics and Detective [Stillman] verifying the physical descriptions given by the CS, officers set up surveillance at the residence and observed Woods' black Cadillac in the driveway, and Grice's black truck parked on the street in front of the house. Officers watched Woods walking out of the house carrying an object (possibly a plastic bag), enter the black Cadillac, place his foot on the brake for a period of time and then leave.

(Doc. # 29, pp. 1-2).

Thus, according to the government, "[A] CS provided information. [Stillman] verified the information. Surveillance was established that lead [sic] to officers forming a reasonable suspicion that criminal activity was occurring at the residence and that Woods was involved in the commission of the criminal activity." *Id.* at 4.

        a.     *Information Provided by the Source*

Through the introduction of hearsay, the government established that Stillman, who was directing the investigation, had received by telephone secondhand information from an

otherwise reliable confidential source who had been useful in the past (Hearing Transcript, Volume II ["Tr. II"] at 6-8).[8]  The source, however, did not have firsthand knowledge of the information (Tr. II at 37), but claimed instead that the information he relayed to Stillman originated from a good friend.  Nothing else was known by Stillman  - or by this court - about the "good friend's" identity, role, means of observation,[9] or reliability (Tr. II at 36-39). Moreover, there is no evidence that the arguably true source, i.e. the anonymous friend, ever communicated with the police directly.

The court's review of the evidence in this case leads to the conclusion that the tip provided "virtually nothing from which one might conclude that [the anonymous source] is either honest or his information reliable; likewise the tip [gave] absolutely no indication of the basis for the [the anonymous source's] predictions regarding [the] . . . criminal activities" alleged.  *Alabama v. White*, 496 U.S. 325, 329 (1990) (holding that the information from an anonymous source was corroborated sufficiently to raise a reasonable suspicion that the defendant was transporting controlled substances).  Thus, the court evaluates the information as having come from an anonymous or unknown source.  *See*, *e.g.*, *Florida v. J.L.*, 529 U.S. 266, 268-69 (2000) (distinguishing *Alabama v. White* and concluding that the source's

---

[8]*See* Fed. R. Evid. 104(a) ( "Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . .. In making its determination it is not bound by the rules of evidence except those with respect to privileges."); *United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.") (citing Rule 104(a); *United States v. Matlock*, 415 U.S. 164 (1974); *Brinegar v. United States*, 338 U.S. 160 (1949)).

[9]In other words, for aught that appears, the "good friend" may have heard it from yet another person.

information was not sufficiently corroborated).

The anonymous source stated that the residence located at 589 Holcombe Street in Montgomery contained a large quantity of narcotics (Tr. I. at 10).[10] He further stated that individuals named Preston Grice, "Corey," and "Bunky" were at the residence, but there is no reliable evidence that the anonymous source provided Corey's or Bunky's surnames or a physical description of any of the subjects named, or nicknamed, as the case may have been *Id.*[11]

---

[10]The court has no evidence regarding the identity of the anonymous source but opts for the use of the male pronoun to avoid the awkward overuse of "he or she". This should not be construed by the reader as an indication of evidence of the source's gender.

[11]This presents the court an opportunity to express its concern with the way much of the government's evidence was offered in this case. Although the court can speculate as to why the government did not call Stillman, who undoubtedly would have proven to be the most credible witness regarding the information provided to *him* by the anonymous source as well as *his* actions and *his* observations, as already noted, the government is free to introduce Stillman's statements through others, though in retrospect it may have been imprudent to do so.

Although the court is not bound by the rules of evidence in a suppression hearing, the principles and concerns underlying the rules still weigh heavily on the court's consideration of the evidence offered. For example, simply stated, "[t]he hearsay rule . . . is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." ***Chambers v. Mississippi***, 410 U.S. 284, 299 (1973).

> Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the [fact finder].

*Id.*

In the instant case, the court finds the testimony offered by Edwards regarding Stillman's knowledge, observations, and actions troubling in many respects—not the least of which is

Finally, the source stated that Grice drove a black pickup truck, Corey drove a gold Chevrolet Caprice and Bunky drove a black Cadillac (Tr. II at 8).

### b.    Corroboration

> Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, *see Adams v. Williams*, 407 U.S. 143, 146-47 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," *Alabama v. White*, 496 U.S. [325,] at 329 (1990). . . . [H]owever, there are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Id.* at 327.

*Florida v. J.L.*, 529 U.S. at 270 (parallel citations omitted).

Upon receiving the information from the anonymous source and within the estimated 30 minutes that transpired between the receipt of the information and the surveillance of the house, Stillman discovered that Grice had somehow been connected to a drug related crime,

---

Edwards's and the government's failure to establish a foundation for his asserted knowledge (*i.e.*, Edwards never stated that Stillman conveyed the relevant information). Substantively, the court finds unconvincing Edwards's testimony, upon prompting by the government's counsel, that the source had described "Bunky" to Stillman as having dreadlocks. Previous questions directed to Edwards regarding the information conveyed by the source to Stillman elicited nothing about a physical description, a point Edwards acknowledged on cross-examination. (Tr. II at 6-36; 49). Furthermore, he conceded that his written report of the incident did not mention that the source provided a physical description, and his testimony suggests that he was confusing what the source may have told Stillman with Stillman's personal observations during the surveillance. (Tr. II at 48-50).

This represents but one of several key aspects of Edwards's testimony with which the court takes exception. The court reserves its discussion regarding these points for more appropriate placement in this recommendation.

18

the nature of which was never revealed to the court.[12]  Stillman then went to the residence

and observed a black Cadillac, black truck and gold Caprice parked outside (Tr. II at 11).

Stillman then observed someone later identified as Woods enter the Cadillac with

something in his hands, remain seated in the Cadillac momentarily with the brake lights

illuminated, and then leave the property.[13]  Stillman then directed Drummond to follow

---

[12]On this point, Edwards's testimony is vague and arguably conflicting.  Initially, Edwards stated that the database "Stillman checked . . . showed that Mr. Grice had either been arrested or had information relating to Mr. Grice and the sale *or* use of narcotics" (Tr. II at 9).  He then stated that Grice had been prosecuted and convicted of a drug related crime, but he did not specify whether Stillman knew this before conducting the surveillance and ordering the traffic stop at issue in this case (Tr. II at 10).  Considering his initial testimony regarding the database Stillman initially accessed as well as the very brief period of time between having received the information and beginning surveillance, the court concludes that Stillman did not know that Grice had previously been convicted of a drug related crime.  Stillman did know, however, that Grice was historically linked to a drug related offense, but he did not know the nature of either the offense or the link.

[13]Edwards testified that Stillman saw Woods, whose identity was unknown at the time, leave 589 Holcombe Street and get into the Cadillac with something that he thought looked like a plastic bag in his hands.  The testimony regarding the plastic bag is not persuasive, however, because Edwards's demeanor at the hearing indicated a lack of certainty with respect to Stillman's observations.  Upon cross-examination of Edwards, it became clear to the court that Edwards was testifying as to Stillman's subjective belief, but Edwards never described what Stillman saw, objectively speaking, that led Stillman to conclude (reasonably or unreasonably) that Woods was carrying a bag–plastic, paper or canvas (Tr. II at 33).  Furthermore, Edwards acknowledged that he had previously testified that the object Woods was carrying was unidentifiable and that nobody involved in the surveillance was able to identify it with certainty (Tr. II at 33-34).

Edwards's testimony that Stillman saw Woods leave 589 Holcombe Street is similarly unpersuasive.  Edwards almost immediately thereafter testified that from Stillman's perspective, Stillman was unable to see the front door of the house  (Tr. II at 13).  Consequently, Stillman, through Edwards, could not say whether another individual (later identified as Corey Harvey) whom Stillman observed coming from and going toward the direction of the subject residence and "approaching different vehicles that stopped in the road" was "actually" going into or coming out of the house.  *Id.*  It follows, then, that Stillman could not have seen Woods leave the house, and the fact that the Cadillac was parked in the driveway at 589 Holcombe Street does not mean that the person who entered the vehicle was actually in the house.  Assuming it was reasonable for Stillman to conclude that Woods emerged from 589 Holcombe Street, the fact that Woods may have been in the house does not alter the court's analysis or conclusion without corroborative evidence of illegal

Woods (Tr. I at 10-11), and thereafter, Mills conducted his stop.

In essence, then, at the time Woods was stopped, the police knew that three vehicles matching a general description provided by an unknown source were parked in close proximity to a house on Holcombe Street that this same unknown source had identified as a repository for narcotics. An unidentified individual entered one of the vehicles—a black Cadillac—with an unknown object in his hands, sat in the car for a few minutes and then drove off. This is what the government now contends established a reasonable suspicion that Woods was transporting narcotics. In addition, police knew that one of the individuals named by the anonymous source was somehow previously connected to an unidentified drug-related offense, but this individual's location at the time was never established.

The vulnerability of the government's case is perhaps more convincingly exposed by particularizing the information not known by the police. As already discussed, the police did not know the source providing the information and never had direct contact with the source. The police did not know how the source obtained his information.

The police did not have any information that the subject house had ever been connected to criminal drug activity (Tr. I at 33-34). The police did not know who was actually in the house and could not see who may have been going into or coming out of the

---

activity. *See Nunez*, 2006 WL 1888957 at *1 (noting that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime"); *see also Florida v. J.L.*, 529 U.S. at 272.

In addition, the government never established whether Stillman observed the individual approaching the vehicles in the road before or after Stillman directed that Woods's car be stopped.

house.  That is to say, the police did not know whether any of the persons named by the unknown source, including Grice, the one individual who the police knew may have had a drug-related criminal record, was actually in the house.

The police did not know who owned the vehicles, drove the vehicles or rode in the vehicles matching the general description provided by the unknown source and parked outside the subject residence.  The police did not know any identifying physical characteristics of any of the persons named by the unknown source.

The police did not know anything about how the alleged drugs were being distributed from the house (i.e., the source did not provide any information about the actual selling activity that he stated was taking place).  The police did not know who it was that entered the Cadillac or where he might have been going.

Nevertheless, the government contends that the police had reasonable suspicion that this unknown person carrying an unidentifiable object from the driveway of a house whose occupants and contents were unknown was transporting controlled substances in a darkly tinted Cadillac matching the general description provided by an unknown source.  The government's position is untenable.[14]

---

[14]That the police were ultimately found to have been correct is at once affirming and disheartening: affirming because it demonstrates the reliability of police instincts even when driven by little more than a hunch; disheartening because the combination of (1) over-reliance on these instincts, (2) hastiness, and (3) a resulting lack of preparation may mean that a potentially dangerous individual who is probably involved in drug trafficking will once again feel free to pursue his criminal enterprise  without regard for society's rules.  Although the court makes no apologies for applying the law in a manner that guarantees the protection of Woods's constitutional rights, this ruling should not be misconstrued by Woods or anyone else as a sanctioning of criminal activity or as a criticism of law enforcement beyond the strict bounds of this prosecution.

All of the objective facts known by the police were readily observable and were not presumptively suggestive of criminal activity, except, perhaps, a violation of Alabama's tint law.

In 2000, the United States Supreme Court confronted an anonymous tip that a young black man standing on the sidewalk and wearing a plaid shirt possessed a concealed gun on his person. *Florida v. J.L.*, 529 U.S. 266 (2000). Following up on the tip, the police observed among a small group of people a young black man standing on the sidewalk wearing a plaid shirt, as the source had stated. *Id.* at 268. Nevertheless, the Court held, in short order, that the police lacked the reasonable suspicion necessary to detain him for further investigation. *Id.* at 273-74. The corroboration failed to establish that the anonymous source had "knowledge of . . . criminal activity. The reasonable suspicion . . . at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272. Consequently, the police officers' actions violated J.L.'s Fourth Amendment rights.

In 2004, the Court of Appeals confronted "an issue of the first impression in this circuit: when does an anonymous tip give rise to reasonable suspicion sufficient to justify a *Terry* stop?" *United States v. Heard*, 367 F.3d 1275, 1276 (11th Cir. 2004) (referring to *Terry v. Ohio*, 392 U.S. 1 (1968), which first upheld a brief detention based on reasonable suspicion of criminal activity in the face of a Fourth Amendment challenge). In that case and several similar cases arising since then, the Court of Appeals has consistently distinguished the circumstances before it from those faced by the Supreme Court in *J.L. See United States*

*v. Fields*, No. 05-15309, 2006 WL 1117877 (11th Cir. April 26, 2006) (table); ***United States***

***v. Davis***, No. 05-12944, 2006 WL 786711 (11th Cir. Mar. 29, 2006); ***United States v.***

***Medlock***, 146 Fed. Appx. 470 (11th Cir. 2005) (table); ***United States v. Anderson***, 131 Fed.

Appx. 212 (11th Cir. 2005) (table); ***United States v. Benitez-Macedo***, 129 Fed. Appx. 506

(11th Cir. 2005); *cf.* ***United States v. Holloway***, 290 F.3d 1331 (11th Cir. 2002)

(distinguishing ***J.L.*** in the context of a warrantless search of a residence).

The instant case is unmistakably distinguishable from the cases addressed by the

Court of Appeals, both with regard to the quantity and quality of information known by the

police.  If the "reasonable suspicion" requirement and the holding in ***J.L.*** mean anything,

they must at least mean that in this case the police lacked reasonable suspicion that Woods

was involved in criminal drug activity when Mills stopped him.  Consequently, the traffic

stop was unlawful as were the subsequent searches of Woods's vehicle and person, arrest and

continued detention immediately following his arrest.

### B.   *Remaining Issues*

> Once it is established that the government conducted an
> unlawful [seizure] . . ., and the defendant moves to suppress
> evidence proffered by the government on the grounds that it is
> fruit of the poisonous tree, the burden is on the government to
> show that such evidence was not obtained as a direct result of
> the illegal [seizure].

***United States v. Crosby***, 739 F.2d 1542, 1549 (11th Cir. 1984).

Woods has moved to suppress all of the evidence obtained against him as a result of

23

the unlawful traffic stop, including statements he made during the stop and the ensuing

detention and arrest (Docs. ## 20, 26).  The government does not attempt to argue that any

of the evidence obtained against Woods was not obtained as a direct result of the unlawful

stop and offers no evidence that would support such an argument.  Therefore, the court

concludes that all of the government's evidence against Woods should be suppressed.


### III.    CONCLUSION

Therefore, it is the RECOMMENDATION of the Magistrate Judge that Woods's

motion be GRANTED and that the evidence obtained as the result of the unlawful stop be

EXCLUDED from a trial against him. .  It is further

ORDERED that the parties are DIRECTED to file any objections to the said

Recommendation on or before **1 August, 2006.**  Any objections filed must specifically

identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous,

conclusive or general objections will not be considered by the District Court.  The parties are

advised that this Recommendation is not a final order of the court and, therefore, it is not

appealable.

Failure to file written objections to the proposed findings and recommendations in the

Magistrate Judge's report shall bar the party from a *de novo* determination by the District

Court of issues covered in the report and shall bar the party from attacking on appeal factual

findings in the report accepted or adopted by the District Court except upon grounds of plain

error or manifest injustice.  ***Nettles v. Wainwright***, 677 F.2d 404 (5th Cir. 1982).  *See **Stein***

24

*v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also **Bonner v. City of Prichard**,* 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on 30 September 1981).

DONE this 19th day of July, 2006.


/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE